UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
ANTAEUS ENTERPRISES, INC., et al.,

                            Plaintiffs,


            -against-                                          05 Civ. 6396 (LAK)


SD-BARN REAL ESTATE, L.L.C., et ano.,

                            Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OPINION**


            Appearances:


                        Daniel H. Weiner
                        Amera Z. Chowhan
                        Michael P. Schept
                        HUGHES HUBBARD & REED LLP
                        *Attorneys for Plaintiffs*


                        L. John Davidson
                        *Defendant* Pro Se


LEWIS A. KAPLAN, *District Judge.*

            Creditors of a corporation move for summary judgment against the corporation's sole

owner in connection with the company's failure to make payments due under promissory notes.


                            *Facts*

            Although there are disputes as to an abundance of unimportant details, the material

facts are undisputed. Unless otherwise noted, the following facts are undisputed for purposes of this motion.

## I.     The Parties

Plaintiff Antaeus Enterprises, Inc. ("Antaeus") is a private investment corporation incorporated in Delaware with its principal place of business in New York. The remaining plaintiffs are three individuals, Eugene Brody, a citizen of New York, and James H. Rand and William G Cooling, citizens of Connecticut.[1]

Defendant SD-Barn Real Estate, LLC ("SD-Barn") is a New Hampshire limited liability company, of which defendant L. John Davidson, a New Hampshire citizen, is the sole member. SD-Barn holds no regular meetings, generally has no employees and, until October 2002, had no business or assets and had not been used for any purpose.[2]

## II.     The DIP Loan

### A.     Pasteurized Egg Corporation

In 2001 and 2002, plaintiffs invested in a company founded by Davidson called Pasteurized Egg Corporation ("PEC"). Davidson, Rand, Brody, Antaeus representative John Beinecke, and an individual named Arthur Blasberg served on PEC's board of directors.[3]

---

[1]     Def. Rule 56.1 St. ¶ 1.

[2]     *Id.* ¶¶ 3, 4, 13, 52-58.

[3]     *Id.* ¶¶ 6-7.

In September 2002, the members of the PEC board met to discuss various options for dealing with PEC's then-existing financial difficulties. They agreed that PEC would take out a $700,000 debtor-in-possession loan (the "DIP Loan"), with SD-Barn acting as the financing vehicle. Investors would lend money to SD-Barn, which in turn would lend the funds to PEC.[4]

In October 2002, Antaeus, Brody, and Rand each lent $100,000 and Cooling $50,000, which together amounted to half of the DIP Loan, to SD-Barn.[5] The remaining $350,000 was supplied by Davidson and an individual named Frederick Flather (together with plaintiffs, the "DIP Lenders").[6] SD-Barn issued promissory notes to each DIP Lender and extended the $700,000 DIP Loan to PEC. PEC executed a note in favor of SD-Barn (the "PEC Note").[7]

B.    *National Pasteurized Eggs*

1.    *The NPE Note*

PEC in July 2003 agreed to sell substantially all of its assets to an Illinois company called National Pasteurized Eggs, LLC ("NPE").[8] As part of that transaction, NPE agreed to assume PEC's obligation to repay the DIP Loan. It subsequently made a $200,000 cash payment to SD-Barn

---

[4]    *Id.* ¶¶ 8-12.

[5]    *Id.* ¶ 13.

[6]    *Id.* ¶ 14. Davidson contributed $300,000 while Flather contributed $50,000. Stip. Facts. ¶ 8. "Stip. Facts" refers to the "Stipulated Facts" section of the Joint Pre Trial Order, dated September 22, 2006 (docket item 76).

[7]    Def. Rule 56.1 St. ¶¶ 15-17.

[8]    *Id.* ¶¶ 5, 18.

4

and delivered to SD-Barn a promissory note in the amount of $592,250.73 (the "NPE Note"), which represented the remaining amount due on the PEC Note, including accrued interest.[9]

The NPE note provided that NPE would make monthly interest payments and two principal payments to SD-Barn. The first principal payment would be made on July 31, 2004 in the amount of half of the total principal balance then outstanding. The second payment would be made on July 31, 2005 in the amount of the remaining principal balance.[10]

### 2.  *The Amended Notes*

After paying expenses, SD-Barn distributed the balance of NPE's $200,000 cash payment on a *pro rata* basis to each of the DIP Lenders. It then issued amended and restated promissory notes (the "Amended Notes") in the following amounts:

- Antaeus:     $85,521.39
- Brody: $84,171.34
- Rand:       $85,219.81
- Cooling:     $42,836.91
- Davidson:    $251,808.50
- Flather:     $42,532.06[11]

The Amended Notes required SD-Barn to deliver to each DIP Lender that lender's *pro rata* share of any payments made by NPE to SD-Barn within five days of SD-Barn's receipt thereof. The Amended Notes provided further that SD-Barn's failure to make timely payment of

---

[9]  *Id.* ¶¶ 19-20.

[10]  Chowhan Aff. Ex. L (NPE Note); Stip. Facts. ¶ 22.

[11]  Def. Rule 56.1 St. ¶¶ 21-23.

5

principal or interest thereunder would constitute an "Event of Default," which would trigger a right to acceleration upon exercise of which all sums payable pursuant to the Amended Notes would "become immediately due and payable without further notice or demand."[12]

### 3.      The NPE Assignment

As collateral for the Amended Notes, SD-Barn assigned to plaintiffs its rights under the NPE Note, including its right to collect payment thereunder (the "NPE Assignment").[13] The NPE Assignment provided as follows:

> "[SD-Barn] hereby assigns, transfers, and sets over unto [plaintiffs] all of [SD-Barn's] right, title and interest in and to the [NPE Note], together with all rights to collect payments of principal and interest due or to become due under the [NPE Note]; *provided*, *however*, that this Assignment is made, in trust, for the purposes of securing [SD-Barn's] performance of its obligation under the [Amended Notes] . . . and [plaintiffs] shall have no rights to enforce the [NPE Note] unless [SD-Barn] fails to pay amounts when due, by maturity or acceleration under the nonrecourse notes held by [plaintiffs].[14]

### C.      The Default

From September 2003 to July 2005, NPE made monthly interest payments to SD-Barn totaling $43,184.98 (the "NPE Interest Payments").[15] In addition, NPE on July 31, 2004 made

---

[12]

> *Id.* ¶¶ 24-25.

[13]

> *Id.* ¶ 26.

[14]

> Rand Aff. (docket item 57) Ex. A § 1.1.

[15]

> Stip. Facts ¶ 23.

its first principal payment to SD-Barn in the amount $296,125.37 (the "NPE Principal Payment").[16] SD-Barn failed to deliver to plaintiffs their shares of these payments.[17] There is no evidence as to what Davidson or SD-Barn did with the NPE Interest Payments upon receipt from NPE. The parties do not dispute, however, that Davidson caused the NPE Principal Payment to be deposited into SD-Barn's account and, in August 2004, to be transferred to another account under Davidson's control.[18]

On February 2 and March 21, 2005, Antaeus and Brody respectively sent letters to Davidson demanding immediate disbursement of their *pro rata* shares of NPE's payments. All plaintiffs on July 1, 2005 sent a letter to SD-Barn demanding disbursement of their share's of NPE's payments and, pursuant to the terms of the NPE Assignment, that SD-Barn instruct NPE to make all future payments under the NPE Note directly to plaintiffs. The July 1 letter was sent also to NPE, which, apparently in light of the letter, did not deliver to SD-Barn the remaining payments due under the NPE Note,[19] which amounted to $297,359.21 (the "Outstanding NPE Payment").[20]

---

[16]

*Id.* ¶ 24.

[17]

Def. Rule 56.1 St. ¶ 34. In his Rule 56.1 statement, Davidson disputes only the reason for not causing SD-Barn to disburse the funds to plaintiffs. He does not dispute that he failed to do so. *Id.*

[18]

*Id.* ¶¶ 37, 67.

[19]

*Id.* ¶¶ 42-43, 47-49.

[20]

*Id.* ¶ 48. The Outstanding NPE Payment consisted of $296,125.35 in outstanding principal, and $1,233.86 in outstanding interest. *Id.*; Stip. Facts ¶ 32.

*III.    The Litigation*

Plaintiffs commenced this action on July 13, 2005, seeking to recover from SD-Barn and Davidson their *pro rata* shares of the NPE Interest Payments and the NPE Principal Payment. In addition, they sued NPE as a nominal defendant to recover their shares of the Outstanding NPE Payment.

NPE sought, and this Court granted, leave to deposit in the Court's registry the Outstanding NPE Payment, pending the Court's determination of the parties' rights.[21]   The claims against NPE were dismissed,[22] and plaintiffs subsequently moved for summary judgment against SD-Barn and Davidson. Before briefing on the motion was complete, the entire $297,359.21 in the Court's registry was released to plaintiffs pursuant to a stipulation among the parties.[23] The parties agree that this satisfied plaintiffs' claims to their shares of the NPE Principal Payment and the Outstanding NPE Payment,[24] leaving only their claims to their shares of the NPE Interest Payments.[25]

In January 2007, after the briefing of this motion, the Court granted plaintiffs' motion

---

[21]    Order, dated Aug. 12, 2005 (docket item 10).

[22]    Order and Stipulation, dated March 30, 2006 (docket item 47).

[23]    Stipulation and Order, dated Aug. 10, 2006 (docket item 61).

[24]    *See* Def. Mem. 15; Pl. Rep. Mem. 3-4.

[25]    The parties agree also that plaintiffs' collective share of these funds is $21,592.49. Def. Mem. 15; Pl. Rep. Mem. 4; Stip. Facts ¶ 26. They do not specify the value of each plaintiff's individual share.

for default judgment against SD-Barn in the amount $665,284.30.[26] It denied plaintiffs' motion

insofar as it sought default judgment against Davidson.[27]

Now before the Court is plaintiffs' motion for summary judgment on their claims

against Davidson for plaintiffs' shares of the NPE Interest Payments. Plaintiffs seek to hold

Davidson liable on three theories: that (1) SD-Barn was his *alter ego*, (2) he converted the money

owed under the Amended Notes, and (3) he tortiously interfered with SD-Barn's contracts with

plaintiffs.[28]

## Discussion

Summary judgment is appropriate if there is no genuine issue of material fact and the

moving party is entitled to judgment as a matter of law.[29] In deciding a summary judgment motion,

---

[26]

    Order, dated January 29, 2007 (docket item 98).

[27]

    *Id.*

    The Court ultimately granted Davidson's motion to vacate the Clerk's certificate of default as to him. Order, dated Feb. 22, 2007 (docket item 102). The Court based its decision in part on the fact that after defendants filed an opposition to the summary judgment motion, defense counsel withdrew, *see* Endorsed Letter, dated Sept. 12, 2006 (docket item 73), and Davidson proceeded *pro se*.

    Plaintiffs again moved for default judgment against Davidson on March 22, 2007, which this Court denied. Order, dated March 23, 2007 (docket item 108).

[28]

    The Court has jurisdiction over these claims pursuant to 28 U.S.C. § 1332. Plaintiffs are citizens of New York, Connecticut, and Delaware, whereas defendants both are citizens of New Hampshire. Furthermore, the amount in controversy exceeds $75,000.

[29]

    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *White v. ABCO Eng'g Corp.*, 221 F.3d 293, 300 (2d Cir. 2000); *see also* FED. R. CIV. P. 56(c).

9

a district court must resolve all ambiguities and make all reasonable inferences in favor of the nonmoving party.[30]

I.       *Tortious Interference with Contract*

    A.       *Elements*

"Tortious interference with contract requires the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom."[31] No liability lies, however, where the defendant acted in good faith to protect his own legal interest.[32]

---

[30]

    *See Anderson*, 477 U.S. at 255.

[31]

    *Fusco v. Fusco*, 36 A.D.3d 489, 591, 829 N.Y.S.2d 138, 140 (2d Dep't. 2007) (quoting *Lama Holding Co. v. Smith Barney*, 88 N.Y.2d 413, 424, 646 N.Y.S.2d 76 (1996)).

    The parties assume that New Hampshire law governs. The elements of a tortious interference claim, however, are the same under New York and New Hampshire law. *Compare id.* (New York law), *with Hughes v. N.H. Div. of Aeronautics*, 152 N.H. 30, 40-41, 871 A.2d 18, 28 (2005) (New Hampshire law). As there is no conflict with respect to this issue, the Court applies New York law. *See Faulkner v. Nat'l Geographic Soc.*, 452 F. Supp. 2d 369, 375 n.25 (S.D.N.Y. 2006) (law of forum applies if no conflict exists (citing cases)); *Carroll v. LeBoeuf, Lamb, Green & MacRae, L.L.P.*, 392 F. Supp. 2d 621, 625 n.21 (S.D.N.Y. 2005) (same).

[32]

    *Estate of Steingart v. Hoffman*, 33 A.D.3d 465, 466, 823 N.Y.S.2d 29, 30 (1st Dep't 2006); *accord Donovan v. Digital Equip. Corp.*, 883 F. Supp. 775, 788 (D.N.H. 1994) (applying New Hampshire law and citing *Emery v. Merrimack Valley Wood Prods., Inc.*, 701 F.2d 985, 988 (1st Cir. 1983) (citing RESTATEMENT (SECOND) OF TORTS § 773 (1977))).

B.      *Application*

There is no dispute that the Amended Notes were enforceable contracts among plaintiffs and SD-Barn and that Davidson knew about them. Nor do the parties dispute that Davidson intentionally caused SD-Barn to withhold the funds due plaintiffs under the Amended Notes. Davison nevertheless disclaims liability.

1.      *Nonrecourse Clause*s

Davidson first argues that his liability is limited because the Amended Notes contained nonrecourse clauses. Those clauses provided as follows:

> "Upon the occurrence of any Event of Default, the Holder, collectively with the other Assignees under the NPE Assignment, may exercise its rights under the NPE Assignment but its rights shall be limited to the Collateral, as defined in the NPE Assignment, and it shall have no direct claim against the Maker. If the Recast Note is not paid by NPE, the Holder shall not have any direct recourse to the Maker."[33]

Davidson contends that under this language, plaintiffs' recourse in the event of a breach of the Amended Notes would be limited to recovery of monies owed under the NPE Assignment – that is, payments still outstanding under the NPE Note. This is unpersuasive.

Putting aside for a moment whether Davidson's interpretation is correct, the nonrecourse clauses do not control plaintiffs' tortious interference claim. The Amended Notes were contracts between each of the DIP Lenders and SD-Barn. They were not contracts between Davidson and plaintiffs. Accordingly, regardless of the extent to which the nonrecourse clauses limit *SD-*

---

[33]        *E.g.*, Chowhan Aff. Ex. M (contract between SD-Barn and Rand) § 5.2.

*Barn's* liability for breach of the Amended Notes, they do not limit Davidson's liability for tortious interference.

Even if the language of the Amended Notes did bear on Davidson's tort liability, the nonrecourse clauses would not help Davidson here. The clauses provided that in the event of default, plaintiffs would be entitled to exercise their rights under the NPE Assignment and that *those* rights would be limited to recovery against NPE. They did not limit plaintiffs' rights to sue SD-Barn for money already paid by NPE. In other words, if SD-Barn defaulted on the Amended Notes and plaintiffs sought to recover money still owed under the NPE Note, plaintiffs could sue NPE only and not SD-Barn. But if plaintiffs sought to recover money already paid by NPE that SD-Barn simply kept, they properly could sue SD-Barn.

This is made even clearer when one considers the nature and language of the NPE Assignment, which provided that, in the event of a breach of the Amended Notes, plaintiffs would have the right to recover monies that were "due or to become due" to SD-Barn under the NPE Note. But monies that already had been paid no longer were "due or to become due." The collateral for the Amended Notes therefore included only NPE's outstanding payments to SD-Barn under the NPE Note. It did not include payments already made.

### 2.    *Legally Protected Interest*

Davidson argues next that he is not liable because he "had a legally protected interest in securing his own accelerated payment from SD-Barn." According to Davidson, the Amended Notes did not "prescribe a schedule by which each holder was to receive their respected pro rata shares," nor did they provide that *pro rata* payments would "be distributed in conformity with an

12

established time frame."[34] Davidson contends that he therefore had no obligation to cause SD-Barn to pay plaintiffs their *pro rata* shares of each payment made by NPE, so long as plaintiffs received their shares in full sometime during the life of the Amended Notes. In keeping the entirety of NPE's payments, Davidson simply paid himself first and in effect earmarked remaining payments for plaintiffs.

This is unavailing. The Amended Notes expressly provided that all payments made by NPE to SD-Barn would be forwarded on a *pro rata* basis to the DIP Lenders within five days of SD-Barn's receipt thereof. Contrary to Davidson's contentions, the notes did contemplate a time frame for payment, and SD-Barn failed to make the payments within the prescribed time. For Davidson to claim a right to accelerated payment at the expense of timely payments to plaintiffs is simultaneously to read into the Amended Notes language that is not there and contradict language that is. Davidson therefore caused SD-Barn's breach.

C.  *Personal Liability*

This does not end the analysis, however. Under New York law, the director of a corporation ordinarily is not personally liable for causing the corporation to breach its contracts unless grounds exist to pierce the corporate veil.[35] But this is not the rule in New Hampshire.

---

[34]

Def. Mem. 24.

[35]

*Feigen v. Advance Capital Mgmt. Corp.*, 150 A.D.2d 281, 283, 541 N.Y.S.2d 797, 799 (1st Dep't 1989) (citing *Murtha v. Yonkers Child Care Ass'n, Inc.*, 45 N.Y.2d 913, 915, 411 N.Y.S.2d 219 (1978)).

In *Hangar One, Inc. v. Davis Associates, Inc.*,[36] a company's president, Davis, hired a broker to find a buyer for the company's helicopter. The broker produced a buyer, but no deal was consummated while the brokerage agreement was in effect. After the agreement terminated, Davis caused the company to sell the helicopter to the same buyer without paying a commission to the broker. The New Hampshire Supreme Court held that Davis was personally liable for tortious interference with contract because he knew of the contract between the company and the broker and contrived to sell the helicopter so as to enable the company to avoid payment of a broker fee.[37] Davis argued that he could not be held personally liable because there was insufficient evidence to permit piercing of the corporate veil. The New Hampshire Supreme Court held, however, that it was unnecessary to "consider whether this is an appropriate case for disregarding the corporate fiction because we conclude that Davis' own conduct is actionable in and of itself."[38]

A conflict therefore exists between New York and New Hampshire law. If New York law applies, plaintiffs' tortious interference claim will succeed only if the evidence establishes grounds for piercing the corporate veil. But if New Hampshire law controls, *Hangar One* will apply and Davidson will be personally liable.

### 1.    Choice of Law Generally

The parties assume that New Hampshire law applies because the Amended Notes

---

[36]    121 N.H. 586, 431 A.2d 792 (1981).

[37]    *Id.* at 589, 431 A.2d at 794.

[38]    *Id.* at 588, 431 A.2d at 794.

provided that they "shall be governed by and construed in accordance with the laws of the State of New Hampshire."[39] But the Amended Notes were contracts between plaintiffs and SD-Barn, not plaintiffs and Davidson, and the controlling law clauses were not so broad as to encompass tortious interference claims against third parties.[40] The Court therefore turns to New York's choice of law principles for tort claims.

When confronted with a torts choice of law issue, New York courts conduct an interest analysis, assessing which of the competing jurisdictions has the greatest interest in seeing its law applied to the matter at issue.[41] If the conflict involves a conduct-regulating rule – one that has "the prophylactic effect of governing conduct to prevent injuries from occurring"[42] – "the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders."[43] But when the conflict involves a loss-allocating rule – one that "prohibit[s], assign[s], or limit[s] liability after the tort occurs,"[44] – the interest analysis is conducted in accordance with the principles set forth in *Neumeier v.*

---

[39]     *E.g.*, Chowhan Decl. Ex. M (contract between SD-Barn and Rand) § 6.3.

[40]     *See Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 335-36 (2d Cir. 2005); *accord Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 426 (S.D.N.Y. 2006).

[41]     *Carroll*, 392 F. Supp. 2d at 628 (citing *Padula v. Lilarn Props. Corp.*, 84 N.Y.2d 519, 521, 620 N.Y.S.2d 310, 312 (1994)).

[42]     *Padula*, 84 N.Y.2d at 522, N.Y.S.2d at 311.

[43]     *Id.*

[44]     *Id.* at 522, 620 N.Y.S.2d at 312.

*Kuehner*.[45]

Neumeier* provides three guidelines for courts considering the interests of competing jurisdictions. The first applies when the parties are domiciled in the same state, in which case the law of the state of the common domicile applies. The second rule applies when the parties are domiciled in different states and the law of each state is favorable to its respective litigant. In that case, the law of the place where the tort occurred applies. The third *Neumeier* rule applies to all other split-domicile scenarios.[46] The law of the state where the tort occurred presumptively controls, except where "displacing [the law of the place of the tort] 'will advance the relevant substantive law purposes without impairing the smooth working of the multi-state system or producing great uncertainty for litigants.'"[47]

2.      *This Case*

The potentially relevant states are (1) New York, of which Brody is a citizen and the location of Antaeus' principal place of business, (2) New Hampshire, where Davidson is a citizen, SD-Barn was formed, and Davidson caused SD-Barn to breach the Amended Notes, (3) Connecticut, of which Rand and Cooling are citizens, and (4) Delaware, where Antaeus is incorporated. Delaware and Connecticut law, however, accord with New York law on the issue of director liability for

---

[45]       31 N.Y.2d 121, 335 N.Y.S.2d 64 (1972).

[46]       *Carroll*, 372 F. Supp. 2d at 628-29 (citing *Neumeier*, 31 N.Y.2d at 128, 335 N.Y.S.2d at 70).

[47]       *Neumeier*, 31 N.Y.2d 121, 128, 335 N.Y.S.2d 64, 70.

causing a company's breach of contract.[48] Accordingly, the analysis must focus on whether New York or New Hampshire has the greatest interest.

The Court need not decide whether the rule here properly is considered conduct-regulating or loss-allocating. If it is labeled conduct-regulating, the law of New Hampshire would control, as that is where the tort occurred. If it is loss-allocating, *Neumeier*'s third rule would apply because this is a split-domicile case and no party is benefitted by the application of the law of its own domicile. Moreover, no interest in preserving certainty in litigation or the smooth workings of the multistate system would be advanced by applying the law of a state other than New Hampshire's. Indeed, it would make sense that New Hampshire law would apply, as that is where SD-Barn was incorporated and Davidson controlled its activities. Davidson should not be able to take advantage of New York's more favorable law concerning personal liability of corporate directors merely because he caused SD-Barn to contract with New York residents. Regardless of how one classifies the rule at issue, therefore, New Hampshire has the greatest interest in seeing its law applied.

Accordingly, New Hampshire law applies regardless of whether the rule in question is conduct-regulating or loss-allocating. *Hangar One* controls and Davidson is personally liable for causing SD-Barn's breach of the Amended Notes regardless of whether this is an appropriate case for disregarding the corporate form.

---

[48] *See, e.g.*, *Barker Capital LLC v. Rebus LLC*, No. Civ.A. 04C-10-269 (MMJ), 2006 WL 246572, *9 (Del. Super. Ct. Jan. 12, 2006) (Delaware law); *Goellner v. MGA, Inc.*, No. CV980164759S, 2001 WL 100303, *3, 6 (Conn. Super. Ct. Jan. 17, 2001) (Connecticut law).

*III.     Prejudgment Interest*

Under *Erie Railroad Co. v. Tompkins*,[49] a federal court sitting in diversity applies federal procedural law and the forum state's substantive law. The availability of prejudgment interest is considered a substantive rather than procedural issue for *Erie* purposes.[50] The Court therefore applies New York choice of law principles, which dictate that the law of the jurisdiction whose law determined liability controls also the allowance of prejudgment interest.[51]

New Hampshire law provides for prejudgment interest to be awarded in all "civil proceedings at law . . . in which a verdict is rendered or a finding is made for pecuniary damages to any party."[52] New Hampshire Revised Statutes § 336:1 provides as follows:

> "The annual simple rate of interest on judgments, including prejudgment interest, shall be a rate determined by the state treasurer as the prevailing discount rate of interest on 26-week United States Treasury bills at the last auction thereof preceding the last day of September in each year, plus 2 percentage points, rounded to the nearest tenth of a percentage point. On or before the first day of December in each year, the state treasurer shall determine the rate and transmit it to the director of the administrative office of the courts. As established, the rate shall be in effect beginning the first day of the following January through the last day of December in

---

[49]
    304 U.S. 64 (1938).

[50]
    *Schwimmer v. Allstate Ins. Co.*, 176 F.3d 648, 650 (2d Cir. 1999)

[51]
    *Gold-Flex Elastic Ltd. v. Exquisite Form Indus., Inc.*, No. 95 Civ. 3881 (LMM), 1995 WL 764191, *2 (S.D.N.Y. Dec. 28, 1995) (citing *Patch v. Stanley Works*, 448 F.2d 483, 494 n.18 (2d Cir. 1971) (noting "consistent line" of decisions holding that under New York choice of law principles "allowance of pre-judgment interest is controlled by the rule of the jurisdiction whose law determines liability") and *Entron, Inc. v. Affiliated FM Ins. Co.*, 749 F.2d 127, 131 (2d Cir. 1984) (following *Patch*)).

[52]
    N.H. REV. STAT. § 524:1-b.

each year."[53]

In a tort case, prejudgment interest accrues from the time the suit is filed.[54] Furthermore, the New Hampshire Supreme Court held in *Linteau v. Gauthier*[55] that "[a]pplying a single rate of interest to the period from the date of the [complaint] to the verdict would not realistically reflect the economic market of our time."[56] When the period from filing to judgment spans multiple years, therefore, a court does not apply to the whole period the interest rate that was in place when the complaint was filed, but "appl[ies] to each new year the then-current interest rate."[57]

Plaintiffs filed suit on July 13, 2005. The New Hampshire State Treasurer determined

---

[53]

*Id.* § 336:1.

[54]

*Id.* § 524:1-b.

Plaintiffs argue that prejudgment interest accrues from the time a demand is made. This is correct insofar as plaintiffs sought to recover against SD-Barn. N.H. REV. STAT. § 524:1-a provides in relevant part that "[i]n the absence of a demand prior to the institution of suit, in any action on a debt or account stated or where liquidated damages are sought, interest shall commence to run from the time of the institution of suit." When a plaintiff does make a demand, interest is deemed to accrue from the date of demand. *See In re Estate of Ward*, 129 N.H. 4, 12, 523 A.2d 28, 34 (1986); *Lipski v.Polonsky*, 122 N.H. 528, 530, 446 A.2d 1178, 1179 (1982). Plaintiffs' tortious interference claim against Davidson, however, is not an "action on a debt or account stated." Accordingly, N.H. REV. STAT. § 524:1-b applies, which provides that "[i]n all other civil proceedings at law or in equity in which a verdict is rendered or a finding is made for pecuniary damages to any party . . . there shall be added forthwith by the clerk of court to the amount of damages interest thereon from the date of the writ or the filing of the petition to the date of judgment."

[55]

142 N.H. 460, 703 A.2d 266 (1997).

[56]

*Id.* at 461, 703 A.2d at 267.

[57]

*Id.* at 462, 703 A.2d at 267.

the prejudgment interest rate to be 4.0 percent for 2005, 5.7 percent for 2006, and 6.8 percent for 2007.[58] Accordingly, each plaintiff is entitled to recover prejudgment interest on its *pro rata* share of the NPE Interest Payments by applying these interest rates in accordance with the *Linteau* case.

IV.    *Attorneys' Fees*

Issues of attorneys' fees are considered substantive for *Erie* purposes.[59] Moreover, the parties point to no material differences between New York's law on attorneys' fees and that of any other jurisdiction.[60] The Court therefore applies New York law.[61]

---

[58]

Http://www.nh.gov/treasury/Tinfo/Tfaq.htm#InterestRate (last visited March 29, 2007).

[59]

*RLS Assocs., LLC v. United Bank of Kuwait PLC*, 464 F. Supp. 2d 206, 213 (S.D.N.Y. 2006).

[60]

While plaintiffs cite New Hampshire cases in their memorandum, New Hampshire law is materially the same as New York law with respect to the issue of attorneys' fees. In New Hampshire, absent a statute or a contract to the contrary, each party bears its own attorneys' fees except in situations where (1) litigation is instituted or unnecessarily prolonged through a party's oppressive, vexatious, arbitrary, capricious, or bad faith conduct, (2) a party must litigate against an opponent whose position is patently unreasonable, *LaMontagne Builders, Inc. v. Bowman Brook Purchase Group*, 150 N.H. 270, 276, 837 A.2d 301, 306-07 (2003), or (3) the defendant's bad faith forced the plaintiff to seek judicial assistance to secure a clearly defined and established right, which should have been freely enjoyed without such intervention, *Thompson v. Poirier*, 120 N.H. 584, 589, 420 A.2d 297, 300 (1980) (quoting *Harkeem v. Adams*, 117 N.H. 687, 691, 377 A.2d 617, 619 (1977)).

Plaintiffs point to no New Hampshire statute that would provide for attorneys' fees in this case. Nor did a contract exist between plaintiffs and Davidson. Moreover, New Hampshire common law in essence provides that a party is entitled to fees only if he or she was forced to endure unnecessary litigation that otherwise would not have occurred but for the other party's bad faith conduct or patently unreasonable legal position. This is materially the same as the standards provided by 22 N.Y.C. R.R. § 130-1.1(a) and (c), which are laid out in the text.

[61]

*Faulkner*, 452 F. Supp. at 375 n.25.

"The court, in its discretion, may award to any party or attorney in any civil action or proceeding before the court, except where prohibited by law, costs in the form of reimbursement for actual expenses reasonably incurred and reasonable attorney's fees, resulting from frivolous conduct."[62] "Frivolous conduct" is defined to include any action if:

> "(1) it is completely without merit in law and cannot be supported by a reasonable argument for an extension, modification or reversal of existing law;
>
> "(2) it is undertaken primarily to delay or prolong the resolution of the litigation, or to harass or maliciously injure another; or
>
> "(3) it asserts material factual statements that are false."[63]

Davidson does not dispute the facts giving rise to liability. Moreover, his interpretation of the nonrecourse clauses and his defense to the tortious interference claim plainly contradict the language of the Amended Notes. Nevertheless, there is no basis here from which to conclude that Davidson's defense was vexatious or intended to prolong the litigation. Nor did Davidson assert materially false statements. The most that can be said is that his arguments were weak. But they were not so lacking in merit that Davidson should be punished for making them. "As is the case with most contentious litigation, without evidence of bad faith, the parties appear to have done little more than zealously defend" their respective positions.[64] The Court therefore is not

---

[62] 22 N.Y.C. R.R. § 130-1.1(a).

[63] *Id.* § 130-1.1(c); *see One Beacon Ins. Co. v. Old Williamsburg Candle Corp.*, 03 Civ. 6901(LAK), 2006 WL 2773019, *1 (S.D.N.Y. Sept. 27, 2006).

[64] *Intertec Contracting v. Turner Steiner Int'l, S.A.*, No. 98 Civ. 9116 (CSH), 2001 WL 812224, *6 (S.D.N.Y. July 18, 2001) (no attorneys' fees where defendant made argument for removal that ultimately was unpersuasive).

persuaded that this is an appropriate case to award attorneys' fees.

*Conclusion*

Plaintiffs' motion for summary judgment [docket item 55] against Davidson is granted. Each plaintiff shall have judgment against Davidson in the amount of that plaintiff's *pro rata* share of $43,184.98 under the Amended Notes, including prejudgment interest in accordance with procedures laid out above. Settlement judgment on four days' notice.

SO ORDERED.

Dated: March 30, 2007

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)